Luis Martínez Gelabert, Plaintiff and Appellee; *v.* Munici-
pality of Río Piedras, Defendant and Appellant.

No. 8848.   Argued June 13, 1944.—Decided November 24, 1944.

154

*E. Acosta Domenech* for appellant. *José Benet* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The Municipality of Río Piedras has been in possession for more than sixty eight years, as owner, of a concrete building which up to four years ago, was used as the municipal slaughterhouse. The lot where the building was erected formed part of a rural property measuring nine acres (*cuerdas*), the possession of which was recorded in favor of Juan Ubarri Capetillo in a possessory title procceding instituted in the Municipal Court of Río Piedras in 1884. A parcel segregated from the property of nine acres was recently urbanized, appearing the lot where the slaughterhouse was situated with No. 25 in the urbanization plat. After several alienations, this lot was acquired by Alejandrina Blanco, who by deed of March 5, 1942, sold it to Luis Martínez Gelabert. The municipality still has in the lot the ruins of the slaughterhouse and alleges that the building as well as the lot belong to it by purchase and because it has been in possession thereof as owner, publicly, peacefully, and uninterruptedly since 1854. Although Luis Martínez Gelabert expressly admits that the building in ruins belongs to the municipality, he maintains, however, that the lot belongs exclusively to him because he acquired the same from Alejandrina Blanco, who had recorded the possession thereof in the

registry of property. In order to settle this controversy, Martínez Gelabert brought this action in the lower court and prayed for a judgment declaring him owner of the lot and ordering the defendant to remove the ruins of the building. The plaintiff alleged that, according to information obtained after he had purchased the lot, one of the former owners of the property of nine acres whose name has not been verified, consented and tolerated the defendant, for more than thirty years without any compensation therefor, to construct the above-mentioned building with the only purpose of using it as a public slaughterhouse; that moved by the same high civic spirit the subsequent owners permitted the public slaughterhouse to continue in the lot until April 1937, when Jesús Blanco Larresca and his children, as owners of the parcel containing the lot, decided to urbanize it, whereupon the defendant then promised to remove the slaughterhouse as soon as another were built; that since August 1940, the municipality has been using a slaughterhouse which it built on another tract of land, abandoning then the old slaughter-house but refusing to remove the building, alleging that it owned the lot; that the lot in question is worth $1,968.96; and that the plaintiff, like the former owners, has paid the taxes levied thereon.

The municipality denied that the plaintiff was the owner of the lot or that it had been in possession thereof or had paid the taxes levied thereon. It affirmatively alleged that the property belonged to it because it had acquired the same for a valuable consideration and because it had been in possession thereof, as owner, for 88 years without having been disturbed in its possession. The defendant ended by praying that the full ownership of the lot be adjudged in its favor, and that an order be issued to the registrar of property directing him to cancel the record made in favor of the plaintiff.

There is not the slightest evidence tending to prove plaintiff's contention to the effect that the defendant built on the lot by mere tolerance or with authorization of one of plaintiff's predecessors in title. The defendant itself has not been able to shed any light as to the date and conditions under which the possession of the city began or when the slaughterhouse was built, nor is there any document in the municipal files which sheds any light on this matter. It is true that in the minutes of the Municipal Board of Río Piedras of February 23, 1854 (plaintiff's "Exhibit 1"), it is set forth that on that day, at a meeting of the board to consider the bids "which were presented to choose the place for the slaughterhouse," the best two were those of Ramón Trigo and Francisco Cruz. The latter, as it appears from the minutes, offered, among other things, to build on his own account, for a certain compensation, a frame building, binding himself to convey the same to the municipality with the equipment, as well as the title to the lot occupied by the slaughterhouse. It does not appear from the minutes, however, that said bid was accepted, and even if it was, there is no showing as to the place where the slaughterhouse would have been constructed, there appearing further the discrepancy that the building offered to be built by Francisco Cruz was one of wood, while the building to which the allegations refer herein is one of concrete, all of which tends to show that the actual building is not the one mentioned in the minutes. Therefore, there is no evidence as to how the municipality came into possession of the lot. The most remote knowledge that we have on this matter comes from José Martínez Llonín, defendant's witness, who testified that he came to live in Río Piedras in 1878 or 1879, and that at that time the slaughterhouse actually in ruins already existed on the lot in controversy.

Let us now turn to the acts of ownership which the plaintiff alleges that his predecessors had exercised on the lot:

1. That while Jesús Blanco Larresca was owner of the parcel of land which contained the lot, and while Joaquín Emanuelli was Mayor of Río Piedras, the city in consideration of the use of the lot, ordered the manure which accumulated in the slaughterhouse to be scattered on certain places of the farm indicated by Blanco, and also that the municipality furnished water for the dairy which Blanco had in the rest of the nine acres of land;

2. That on a certain occasion Mayor Emanuelli tried to build an extension at the back of the building and that Blanco Larresca told him that he did not wish the extension there for which reason the mayor made the extension on the front part where Blanco indicated him;

3. That the municipality authorized the urbanization plat without any objection, notwithstanding the fact that in the place corresponding to lot No. 25 there appeared the words "slaughterhouse to be removed";

4. That when the possessory title proceeding was instituted, the municipality certified that the estate of Ubarri paid the taxes levied on the nine acres of land;

5. That Messrs. Blanco without any objection from the municipality cut and used the pasture which grew on the lot of the slaughterhouse; and that Alejandrina Blanco, who bought the lot on October 25, 1941, occasionally had it cleaned; and

6. That the witness Blanco, before selling the lot to his sister Alejandrina, fenced it himself digging the holes and putting up the posts.

■ Angel Blanco, co-owner of the urbanization and plaintiff's only witness who testified as to the alleged payment for the use of the lot, on being examined by the court, stated:

"Q. Did the municipality pay you any rent for the use? A. Yes, sir.

"Q. How much did it pay you? . . .

". . . A. It scattered the manure and supplied water for the farm.

"* * * * * * *

"Q. Was there any ordinance to that effect? A. As to that particular I can not tell.

"Q. But did they install a pipeline to irrigate the farm? A. Not to irrigate the farm, . . . they supplied us water free for the dairy and they scattered the manure on the farm.

"Q. In exchange of what? A. For the use of the slaughter-house."

And, further, on being cross-examined by defendant's attorney, he testified:

"Q. Did you say that there was no written agreement as to the matter you just mentioned? A. No, sir, I knew there were some suits.

"Q. What were the suits? A. Well, I know that there were suits against the municipality as to that particular.

"Q. But were there legal actions in the court? A. I don't know. I know that the city supplied the manure.

"Q. But were any actions brought in court? A. I don't remember. 1 have heard that there were suits.

"Q. So that what you are testifying here is what you have heard? A. As to the suits, yes.

"The court: Then strike it out."

And referring to the supply of water, he testified:

"The court: It is clear that . . . the municipality does not own the aqueduct, but that the Municipality of San Juan supplies the Municipality of Río Piedras as has been admitted by plaintiff's attorney. Is it true that it supplied the water? A. Yes, sir.

"Q. Did you not pay for that water? A. No, sir.

"Q. You did not pay by tolerance or by some agreement? A. I *suppose* that there was an agreement.

"*           *           *           *           *           *           *

"Q. As far as you know, personally, there was no agreement with the municipality to that effect, that you can remember? A. *Well, as far as I can remember the municipality always scattered the manure on the farm and supplied it with water.*" (Italics ours.)

Accepting as true the testimony of witness Blanco as to said matter, we realize that his testimony is to the effect that, so far as he can remember, the municipality always

scattered the manure within the farm and supplied it with water. This action on the part of the municipality does not necessarily mean that those acts were performed in consideration of the use of the lot. The municipality had on the lot not only the slaughterhouse building, but also a shed where it kept the cattle that was to be killed on the following day, a concrete extension where the manure was accumulated, and the septic tanks where the refuse flowed. It was indispensable for the municipality to have the manure taken away in order to keep the slaughterhouse in good sanitary condition. This manure which was a bother for the municipality proved beneficial for the property of Messrs. Blanco adjoining the lot. The most convenient place for the municipality to dump it was Messrs. Blanco's farm. As to the supply of water it could be rationally understood as a compensation for permitting the municipality to dump the mature in their property.

■ Witness Blanco himself testified that Mayor Emanuelli in compliance with Blanco Larresca's orders when enlarging the slaughterhouse, made the extension in the place indicated by said gentlemen. Assuming that the witness was present at the conversation between the mayor and his father, that mere incident with the mayor did not bind the municipality.

■ The fact that the municipality authorized without any objection the urbanization plat wherein the place corresponding to the lot of the slaughterhouse was marked with the words "slaughterhouse to be removed" does not prejudice the possession of the municipality. The plaintiff, as well as the defendant, maintained that the slaughterhouse was in a poor condition and that the municipality intended to build a slaughterhouse in another place, as it in fact did. Mayor Landrau himself testified that the municipality made no objection in approving the plat because it intended to move the slaughterhouse and he did not believe that the

words "slaughterhouse to be removed" could be construed as meaning that the municipality was granting the lot to the estate of Blanco or to any other person; and that if he had suspected that the intention of the Blancos in writing those words in the plat was to appropriate the lot neither he nor the Assembly would have authorized the plat. He further testified that they moved the slaughterhouse to another place because the lot was too small and the place was not proper because the surroundings had been urbanized; that the old slaughterhouse had been built when only three or four heads of cattle were killed in Río Piedras, but at the time that the new one was built 16, 20, and 30 heads were killed daily; and that the municipality was planning to build a jail on that lot.

Conceding that in 1884, at the time the possessory title proceeding was instituted, Juan Ubarri Capetillo appeared as paying taxes on the parcel of nine acres, we find that since 1884, when the certificate was issued, until 1942, when the complaint herein was filed, 58 years have elapsed during which it has not been shown that plaintiff's predecessors in interest paid any taxes on the lot in controversy. It is true that at the trial the plaintiff offered in evidence a document in order to prove that he paid the taxes on the lot, but the court refused to admit the same because in said document the lot to which the taxes referred was not identified and since they did not ask that the document be marked as evidence offered but not admitted, it does not appear in the record on appeal.

Nor is the possession of the municipality prejudiced by the fact that plaintiff presented some evidence tending to prove, that some of his predecessors cut the pasture which grew on the lot occupied by the slaughterhouse. The lot was being used as a slaughterhouse and the pasture which grew on that lot, far from being of any advantage to the municipality, was rather prejudicial to it, so, the fact that the municipality permitted the pasture to be cut may be understood

as a mere tolerance on its part since it did not need the pasture, and not as an admission of title in favor of the plaintiff's predecessor.

The testimony of Mr. Blanco with respect to the fence of the lot was contradicted by Mayor Landrau who stated that the lot had never been fenced (as it was unnecessary), inasmuch as the cattle was kept in the above-mentioned shed. Witness Blanco himself, on cross examination, admitted that there was no sign of such a fence. But supposing that Blanco had fenced the lot at some other time, we do not see how this act, which was not adverse to the possession of the defendant, could have prejudiced the same, unless when putting up the fence the municipality should have been deprived of some part of the lot.

Let us examine the testimony of José Benet, plaintiff's attorney. He testified that he married Alejandrina Blanco in 1938; that after his marriage, his wife executed a general power of attorney in his favor and that he immediately intervened in the affairs of the Blanco brothers as if he were one of the co-owners of the estate; that he took charge of the urbanization with engineer Julio Marrero.

The testimony of Mr. Benet, far from supporting that of his brother-in-law, Angel Blanco, weakens the same since it tends to show that the Blanco brothers were never sure of their status as owners of the lot until in 1941 Mr. Benet, together with the municipal secretary, made a search in the municipal files in order to verify whether or not the municipality had any evidence of title to the lot. To this effect, the witness states:

". . . In 1941, at the beginning of 1942, the Municipal Secretary and I, tried to find out some evidence of title in the files of the municipality . . . and there was none. *It was then that we decided to sell the lot.* After doña Alejandrina had been in possession of the lot for some time, we then sold it to don Luis Martínez Gelabert. Don Luis Martínez Gelabert came to Río Piedras, I took him to see the papers, and I showed him that the lot was recorded

free of liens in the registry of property. *I took him to the lot and he took possession thereof.*" (Italics ours.)

On being cross-examined, Attorney Benet was asked if he remembered having gone with Acosta Domenech, attorney for the municipality, to the lot in question, and if there had been any objection to his fencing the lot, to which he answered:

"Well, we were not fencing, it was already fenced. The only objection of my colleague was . . . that we should not interfere with the slaughterhouse nor with the land as he claimed that it belonged to the municipality; then I told my colleague, 'Well, we have bought that land', and then my colleague and I agreed to bring this case in order that the court should decide the controversy, as we could not come to an agreement.

"Q. Was there any objection to your taking possession of the land in any manner? A. Yes, about six or eight months ago."

If as plaintiff alleged, the municipality acquired the use of the lot by mere tolerance or by license of one of the former owners, he being unable to specify which one of them; if according to witness Angel Blanco, his father and he had exercised certain acts of ownership which had been consented and respected by the municipality, such as the construction of the extension of the slaughterhouse and the cutting of the pasture, on what grounds could they suspect that the municipality might have a written title to the lot, and why were they in doubt as to their own title to the lot, until the search in the municipal files showed them that the municipality had no evidence of title?

From plaintiff's "Exhibit 3" it appears that before him and his predecessor Alejandrina Blanco, ten other owners, including some estates (*sucesiones*) such as the estates of Juan Ubarri Capetillo and Jesús Blanco Larresca, composed of several persons, had been in possession of the parcel of nine acres where the lot is situated. It is significant that not until 1941, when Alejandrina Blanco acquired title to the lot, none of the former owners had claimed any title to the lot

either by demanding the removal of the building or by asking the defendant to pay the value of the lot or the corresponding rental. It is likewise significant that in the same deed by which the plaintiff purchased the lot for $700.15, a mortgage was executed on the lot in order to secure a note to bearer for the amount of $800, and two additional credits, one for $100 for interest and another for $200 for costs and attorney's fees in case it had to be collected through the court. We do not think that the plaintiff could believe it was rational for anyone to lend him $800 on a lot which he had just bought for $700.15 and if the lot was really worth $1,968.96, as alleged in the complaint, it is also significant that Attorney Benet and his wife should have sold it for $700.15 only.

██ After the foregoing analysis of the evidence we must reach the conclusion that the municipality has possessed the lot, for more than 68 years as owner, publicly, peacefully and uninterruptedly.

██ Having come to this conclusion, we have now before us two simultaneous possessions; that of the plaintiff and its predecessors, which we could call symbolical because it has only existed in the records of the registry of property; and that of the defendant, which we could call actual because it has really existed. Now, which of the two should prevail in order that an acquisition of ownership by prescription should result?

Since the underlying principle of the Mortgage Law is the protection of third parties it can not leave the latter defenseless and for this reason it provides in the first paragraph of § 35 that "The prescription which does not require a good title (*justo título*) shall not prejudice a *third person* if the possession on which it is based does not appear on record." (Italicis ours.) However, the owner who has recorded the possession of a property either by means of a possessory title proceeding or as the last one who acquired

by onerous or lucrative title or any of the intermediate owners does not hold the status of a *third person* contemplated by the last paragraph of said Section, which reads: "With regard to the legal owner of the real property or interest which is in process of prescribing, the title shall be determined and the time computed in accordance with the provisions of the common law" (meaning the general law).

Manuel Dorta Duque, in his work entitled *"Curso de Legislación Hipotecaria,"* p. 297, explains the scope of § 35 of the Mortgage Law of Cuba, identical to our § 35, and states the following:

"Dominion is a real right which connotes a material relation between the owner and the immovable, said relation being carried out through ostensible and public possession, while on the other hand, the mortgage is but a mere juridical relation, intended to insure or guarantee the payment of a debt at maturity. Consequently, the solution of the lawmaker providing that prescription runs against the owner is fair, because in so far as the latter is concerned, the adverse possession of the other party is ostensible and evident; however, said possession will not prejudice the mortgage, for instance, because the latter is not affected nor can be affected by the possessory acts of a third person; he who acquires the dominion is interested in possessing the immovable, and if it is being possessed by some one else in whose name it is not recorded —inasmuch as possession must be public for prescription purposes— the one who holds the dominion title cannot rely on his recorded title, pretending to ignore or deny the necessarily ostensible possessory acts."

And Morell, in his *"Legislación Hipotecaria,"* vol. 2, p. 656, commenting on the same Section of the Spanish Mortgage Law, states the following:

"We believe that Section 35 should be construed according to its own language and since it makes no distinction, the person who owns the real property or real right at the beginning of the prescription period is as much an owner as the one who was in possession at the end, no matter whether he acquired by lucrative title or by onerous title. Besides, all of them are under like circumstances;

all of them, the first as well as the last and the intermediate one, should know who is in possession of their properties and why is he in possession thereof, and they are equally responsible for their abandonment. The law considers, says Escosura, and we agree with him, the owner as well as the possessor as two single representations; the former composed of all the owners which have held a right to the property; the latter of all the possessors who have subsequently enjoyed the property; the last owner suffers the effects of his negligence and that of the former owners just as the last possessor holds all the rights which have been successively acquired through possession by those who held possession thereof prior to him.''

And lastly, as Serna states, ''Any person who sees his own property possessed by another who has not title thereto can only allege deceit. He can not complaint that a law enacted for this purpose can not be invoked in his aid.''[1]

See also Galindo and Escosura "*Legislación Hipotecaria*," vol. 2, p. 411 *et seq.*, and the decisions of the Supreme Court of Cuba of November 3, 1906, November 22, 1913, November 24, 1915, and November 21, 1925.

But notwithstanding the provisions of the last paragraph of § 35 of the Mortgage Law, the plaintiff herein could have never relied on his condition of a third person (*tercero*), since, as we have seen, before he purchased the lot, he visited it together with Attorney Benet and saw the building there, which although in ruins, occupied the lot, learning at that time that said building did not belong to the vendor, all of which operated as a caveat as regards the title alleged by the municipality.

We are of opinion that the trial court erred in weighing the evidence, the judge being led into error by the fact that the plaintiff as well as his predecessors in title had recorded the lot in his favor.

The judgment herein is reversed and a new judgment is entered declaring that the Municipality of Río Piedras is

[1] This citation appears in the work of Galindo and Escosura, ''*Legislación Hipotccaria*,'' vol. 2, p. 411.

the owner of the lot described in paragraph two of the complaint, and inasmuch as the mortgagee was not a party to this action, this judgment will not prejudice the rights of the holder of the note to bearer secured by the mortgage executed by plaintiff and his wife by deed No. 22 dated March 5, 1942 before Notary Miguel Rodríguez Alberty. The recordation of the lot in plaintiff's favor should be canceled. Plaintiff must pay the costs.